*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SUSAN FISLER SILBERSTEIN,

> *Plaintiff-Appellee,*

*v.*

No. 05-3630

CITY OF DAYTON, et al.,

> *Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 02-00522—Sharon L. Ovington, Magistrate Judge.

Argued: December 6, 2005

Decided and Filed: March 3, 2006

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Dawn M. Frick, SURDYK, DOWD & TURNER CO., Dayton, Ohio, for Appellants. Jeffrey M. Silverstein, JEFFREY M. SILVERSTEIN & ASSOCIATES, Dayton, Ohio, for Appellee. **ON BRIEF:** Dawn M. Frick, Edward J. Dowd, SURDYK, DOWD & TURNER CO., Dayton, Ohio, for Appellants. Jeffrey M. Silverstein, JEFFREY M. SILVERSTEIN & ASSOCIATES, Dayton, Ohio, for Appellee.

---

**OPINION**

---

R. GUY COLE, JR., Circuit Judge. This case arose as a § 1983 claim brought by Plaintiff-Appellee Susan Fisler Silberstein for alleged wrongful termination in violation of her First and Fourteenth Amendment rights. City of Dayton Civil Service Board Members James Lindsey ("Lindsey"), Talbert Grooms ("Grooms"), and Betty Toney ("Toney") (collectively referred to herein as the "Board Members"), moved for summary judgment based on the defense of qualified immunity as to both the First Amendment and Fourteenth Amendment claims. The Board Members now appeal the district court's May 28, 2004 order denying summary judgment to all three Board Members as to Silberstein's Fourteenth Amendment claim and denying summary judgment to Lindsey and Grooms as to Silberstein's First Amendment claim. For the reasons set forth below, we affirm the district court's decision as to the Fourteenth Amendment qualified immunity claim, but reverse the district court's decision as to the First Amendment qualified immunity claim.

1

## I. Background

Plaintiff-Appellee Silberstein was employed by the City of Dayton from August 1989 to August 2002. From October 11, 1999, until her termination in 2002, Silberstein held the title of Assistant Chief Examiner of the Civil Service Board (the "Board"). Silberstein was offered the Assistant Chief Examiner position by Sandra Huggins, the Secretary/Chief Examiner for the Civil Service Board. The district court described Silberstein's position as "encompass[ing] the supervision of technical and administrative operations of the Civil Service office, including, but not limited to, the supervision of other analysts administering civil service examinations and assisting in the development of rules, policies, and procedures applicable to carrying out the Civil Service Board's directives." According to Silberstein's deposition testimony, her duties included taking board meeting minutes, drafting correspondence for Huggins's signature, writing narratives for annual reports, proofreading questions for fire department promotional tests, and working on special projects such as statistical analysis of historical retention trends and evaluation of new testing methods. In her position as Assistant Chief Examiner, Silberstein reported directly to Huggins.

About the time that Silberstein began in this position, Dayton's City Commissioners were pursuing the implementation of a diversity plan for the city's fire department. Silberstein and Huggins both expressed disagreement with the plan that was being proposed. In October 2001, Silberstein prepared a report for the Board on the problems that she and her staff saw with the diversity plan that was under consideration. Also about this time, changes were made to the composition of the Civil Service Board; Lindsey joined the Board in January 2002, and Grooms around May 2002. At least one newspaper article, included in the record, attributes these Board replacements to the disputes concerning the fire department's diversity plan. Silberstein testified in deposition that around this time the City Commission began passing ordinances that ordered the Civil Service Board to take specific action to pass particular new diversity rules, a procedure which she believed was in contravention of the proper procedures for passing new Civil Service rules.

On July 25, 2002, without prior notice, Grooms sent Silberstein a letter placing her on paid administrative leave. According to Lindsey's deposition testimony, the Board had been having difficulties "getting Ms. Silberstein to respond to [their] request for action," and there was a general feeling among the Board Members that "Ms. Silberstein and Ms. Huggins . . . were being obstructionists." According to Lindsey's and Grooms's deposition testimony, during the time that Silberstein was on paid leave, the Board was seeking a legal opinion from the city's Law Department regarding Silberstein's employment category in order to determine the required procedures for terminating her employment.

On August 24, 2002, the Dayton Daily News published a letter written by Silberstein that criticized the Dayton City Commission's recent actions in their efforts to implement a new diversity plan. On August 29, 2002, the Board held a meeting at which it voted to terminate Silberstein. Among the topics discussed at the Board meeting was Silberstein's recent letter to the newspaper. Silberstein received a letter the same day stating that "it is apparent to the Board that you are either unwilling or unable to effectively serve the current Board." Silberstein was given no other reason for her termination. Silberstein filed a notice appealing her removal from the Board. She received a letter in response informing her that she did not have a right to appeal.

Silberstein filed her complaint in the Southern District of Ohio in November 2002. Defendants filed a motion for summary judgment in which the Board Members raised the defense of qualified immunity. The district court denied each Board Member's defense of qualified immunity as to Silberstein's Fourteenth Amendment claim, but, in light of the Board Members' argument that they relied upon the advice of counsel, the district court observed that "extraordinary circumstances may yet require the application of qualified immunity" to the Board Members, depending upon the "substance of the advice provided by their attorneys." The order granted

Toney's summary judgment motion on the defense of qualified immunity for Silberstein's First Amendment retaliation claim on the ground that Toney was not present at the board meeting where the Board Members voted to terminate Silberstein, but the court rejected Grooms's and Lindsey's qualified immunity defenses to Silberstein's First Amendment claim.

The defendants then filed a motion to partially alter or amend the judgment and to supplement the record, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, seeking to introduce the legal reports they claim to have relied upon from their counsel regarding Silberstein's employment category. The district court denied the defendants' Rule 59(e) motion.

The defendants appeal the district court's (1) denial of Grooms's, Lindsey's, and Toney's Fourteenth Amendment qualified immunity defenses, and (2) denial of Grooms's and Lindsey's First Amendment qualified immunity defenses.

## II.  Legal Framework

The district court's denial of summary judgment based on the Board Members' qualified immunity defenses is immediately appealable as a collateral order, since the issue appealed concerns only whether the facts alleged show a violation of a clearly established constitutional law and does not concern which facts the parties might be able to prove. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc). We review a district court's qualified immunity determination *de novo*. *Sanderfer v. Nichols*, 62 F.3d 151, 153 (6th Cir. 1995). Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004).

Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has recently articulated a two-prong test for evaluating a qualified immunity question: First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (requiring plaintiff to establish that official's action was "objectively unreasonable in light of the clearly established constitutional rights").

## III.  Silberstein's Fourteenth Amendment Claim

### A.  Whether Silberstein suffered a Due Process violation

The first prong of the qualified immunity analysis asks whether a constitutional violation has occurred. *Saucier*, 533 U.S. at 201. In evaluating whether a Fourteenth Amendment Due Process Clause violation occurred, we must determine whether Silberstein had a property interest that entitled her to due process protection, and, if answering in the affirmative, must then determine what process was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

#### 1.  Property interest

Property interests do not derive from the Constitution, but rather are created and defined by "existing rules or understandings that stem from independent sources such as state law . . . ." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The Supreme Court has recognized that

when a state statute provides that "classified civil service employees" may be dismissed only for cause, the statute creates a property interest in one's employment that is protected by the Fourteenth Amendment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (interpreting Ohio Revised Code § 124.11).

Silberstein points to the City of Dayton Charter (the "Charter") as the existing law that provided her with a property interest in her employment. Like the Ohio statute at issue in *Loudermill*, § 95 of Dayton's Charter divides civil service employees into classified and unclassified service. Under § 100 of the Charter, no classified employee may be terminated until presented with specific written reasons for termination and given an opportunity to be heard in his or her own defense. *Sommer v. City of Dayton*, 556 F. Supp. 427, 431 (S.D. Ohio 1982) (interpreting § 100 protections to apply only to classified employees); *Temple v. City of Dayton*, No. 20211, 2005 WL 38743, at *7 (Ohio Ct. App. Jan. 7, 2005) (same). Under § 101, employees within the classified service who are "suspended, reduced in rank, or dismissed from a department by the director of that department or the City Manager" may appeal to the Civil Service Board. The parties agree that the Charter thus creates a property interest for classified, but not unclassified, employees.

The Board Members argue that Silberstein was not a classified employee and therefore was not entitled to due process protections in her termination. The district court determined that the language of § 95 of the Charter was unambiguous, and that, according to its terms, Silberstein was clearly a classified employee. We review *de novo* a district court's determination of state law. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

Under Ohio law, in the absence of circumstances requiring otherwise, language used in a municipal charter is to be construed according to its ordinary and common usage. *State ex rel. Minor v. Eschen*, 656 N.E.2d 940, 944 (Ohio 1995). If the language is unambiguous, the court must apply the clear meaning of the words used. *Bosher v. Euclid Income Tax Bd. of Rev.*, 792 N.E.2d 181, 183 (Ohio 2003) (citing *Roxane Labs., Inc. v. Tracy*, 661 N.E.2d 1011, 1012 (Ohio 1996)). Thus the language of a city's charter, and not the practice or understanding of the city, ultimately determines an employee's proper classification. *Yarosh v. Becane*, 406 N.E.2d 1355, 1359 (Ohio 1980); *Lewis v. Fairborn*, 706 N.E.2d 24, 26 (Ohio Ct. App. 1997). Relying upon unpublished state court precedent, the Southern District of Ohio has likewise concluded that its construction of the City of Dayton Charter "should be informed by the 'language and logic' of same." *Sommer*, 556 F. Supp. at 431.

The district court properly determined that Dayton's Charter is unambiguous. Section 95 of the Charter clearly divides the city's civil service into two categories, unclassified and classified service, and clearly articulates what these categories include. The unclassified service includes employment positions falling within one of four very specific subcategories, and the classified service includes all other positions not designated as unclassified. The exact language of § 95 reads:

> § 95. The Civil Service of the city is hereby divided into the unclassified and the classified service.
>     (A)  The unclassified service shall include:
>             (1)  All officers elected by the people.
>             (2)  The City Manager.
>             (3)  The heads of departments and heads of divisions of departments and members of appointive boards.
>             (4)  The deputies and secretaries of the Manager and one assistant or deputy, and one secretary for each department, and the Clerk of the Commission.
>     (B)  The classified service shall comprise all positions not specifically included by this Charter in the unclassified service. There shall be in the

classified service 3 classes to be known as the competitive class, non-competitive class, and labor class . . . .[1]

The district court properly determined that Silberstein was a classified employee under the terms of the Charter. The court concluded that Silberstein's position as Chief Assistant Examiner does not fall under any of the four enumerated positions in § 95(A), a conclusion that is not disputed by any of the parties.

Although they concede that the Chief Assistant Examiner position does not fall under any of the § 95(A) categories, the appellants nonetheless argue that Silberstein is an unclassified employee. Their conclusion rests on the premise that the positions enumerated under § 95 are not the sole "unclassified" positions. They argue that when the section states "classified service shall comprise all positions not specifically included *by this Charter* in the unclassified service," it includes the entire Charter, and contemplates the enumeration of unclassified positions elsewhere in the Charter.

The appellants, however, have not demonstrated that any other section of the Charter specifically includes any other positions within the unclassified service. Rather, they would have us infer from language throughout the Charter that the Chief Examiner and Assistant Chief Examiner positions are not classified positions. The appellants point to § 94, which provides for the appointment of the Chief Examiner and Assistant Chief Examiner: "The Board shall appoint a chief examiner who shall also act as secretary. The Board may appoint such other subordinates as may by appropriation be provided for." The appellants attempt to draw a contrast between this appointment process and the language of other Charter sections discussing how classified service positions will be filled. Specifically, § 48 provides that the City Manager shall have the power to "appoint . . . all directors of the departments and all subordinate officers and employees in the departments in both the classified and unclassified service . . . ." In addition, § 97 provides that classified employee positions are to be filled by the Chief Examiner "upon requisition from and after consultation with the City Manager." The appellants argue that § 94 demonstrates that Silberstein's position is not filled by the Chief Examiner or City Manager, but by the Civil Service Board, and therefore of a unique status. The appellants' statutory construction is implausible and must fail.

Nothing in the Charter states that classified or unclassified status is dictated by the title of the individual responsible for filling the position; on the contrary, under § 95 the status is dictated by the position itself. Furthermore, under § 48, the City Manager has the power to appoint both classified *and* unclassified service employees. If the positions provided for under § 94, including the Assistant Chief Examiner, enjoy a unique status because they are not appointed by the City Manager, then the consequence of the appellants' reading is that Silberstein is neither classified nor unclassified. There is nothing in the language of the Charter to support the assumption that a third category of employees exists within the civil service of the city of Dayton. In fact, such a reading contradicts the plain language of § 95 that the "Civil Service of the city is hereby divided into the unclassified and classified service." It also does not comport with common sense that among all the civil service positions described in the Dayton charter, the Chief Examiner and Assistant Chief Examiner are the only ones that do not fall into one of these two categories. Thus, while the defendants are correct that a city charter's construction should be informed by its "language and logic," and construed "in its entirety to achieve its general and complete public purpose, *see Sommer*, 556 F. Supp. at 431, the language and logic of the Charter in its entirety compel the conclusion that Silberstein was a classified employee.

---

[1]Section 95(B) then proceeds to define these three classes of classified service as including, respectively, positions for which qualifications may be tested by competitive exam, positions requiring peculiar and exceptional qualifications, and positions of "ordinary unskilled labor."

The appellants' second textual argument is that employees of the Civil Service Board such as Silberstein cannot be classified employees because then the provision under § 101 of the Charter, allowing certain classified employees to appeal a termination to the Civil Service Board, would be vain or useless. This argument also fails. The ability to appeal a termination decision to the Civil Service Board is not inherently vain or useless merely because the termination decision was made by the Board itself. Any body of decision-makers could change its mind upon reconsideration, and an employee may seek the opportunity to present her arguments in a formal setting. Furthermore, as the appellants note in their brief, § 101 is not likely to apply to Silberstein regardless of whether she is classified or unclassified, because the provision applies only to employees "of any department in the city," and Civil Service is not one of the five "departments" enumerated in the Charter.[2] If the provision does not apply to her at all, then it could not be rendered vain or useless by a determination that her position is classified.

The appellants also argue that Silberstein's position must be unclassified because it requires the exercise of discretion and does not lend itself to being filled by a competitive exam. This argument likewise fails because it is contradicted by the plain language of the Charter. Section 95(B) of the Charter explicitly provides for both competitive classified employees and noncompetitive classified employees. The competitive class includes "all positions and employment for which it is practicable to determine the merit and fitness of applicants by competitive examination," and the noncompetitive class includes "all positions requiring peculiar and exceptional qualifications of a scientific, managerial, professional, or educational character, as may be determined by the rules of the Board." Since both the competitive and noncompetitive classes are among the classified service (along with a third "unskilled labor" class), an employee clearly cannot be considered an unclassified employee simply because her position is not filled by competitive exam. The district court correctly determined that Silberstein's position falls within the noncompetitive class of classified civil service.

The appellants cite to several decisions from the early twentieth century concluding that noncompetitive positions must be unclassified. The decisions cited by the appellants do not control this case. In *State ex rel. Ryan v. Kerr*, 181 N.E. 546, 548 (Ohio Ct. App.), *aff'd by* 183 N.E. 535 (Ohio 1932), the Ohio Court of Appeals concluded that an assistant law director was a member of Cleveland's unclassified service despite the city charter's failure to include that position among the list of unclassified positions, and in so holding emphasized the discretionary and noncompetitive nature of the position. However, the *Kerr* decision attempted to reconcile the language of Cleveland's city charter with the state statute that expressly placed the position within unclassified service. *See* 181 N.E. at 547. Concluding that the city charter could not overrule the state statute without expressly doing so, the court was forced to harmonize the two provisions. *Id.* at 548; 183 N.E. at 536-37. No such contradicting provisions are at issue here: Neither the city charter nor the state statute lists Silberstein's position as unclassified. *See* Ohio Rev. Code § 124.11. Citing to *Kerr*, the Ohio Supreme Court concluded several years later that Akron's assistant law directors and police prosecutors were unclassified employees, interpreting "unclassified" to mean those positions for which merit could not be practically ascertained through competitive exam and "classified" to mean those positions that could so be tested. *See DeWoody v. Underwood*, 27 N.E.2d 240 (Ohio 1940). This decision is superceded by the Charter, which explicitly provided for noncompetitive classified employees, whose merits are not determined through competitive examination. The same is true for the 1920s cases cited by the defendants, *State ex rel. Bryson v. Smith*, 128 N.E. 261 (Ohio 1920), and *Hile v. City of Cleveland*, 160 N.E. 621 (Ohio 1928).

---

[2]Section 51 of the Charter establishes the following five administrative departments: Law, Public Service, Public Welfare, Public Safety, and Finance. Civil Service is treated separately elsewhere in the Charter, and the division is never referred to as a "department."

Because Silberstein was a classified employee entitled to specific termination procedures under the unambiguous terms of the Charter, Silberstein had a property interest in her employment that triggered due process protection.

## 2. Deprivation without due process

Having recognized that Silberstein had a property right entitled to due process protection, we must determine what process Silberstein was due. Although the existence of a property interest is defined by state law, the procedures that must be followed in depriving an individual of that property interest are defined by the federal Constitution. *Loudermill*, 479 U.S. at 541. For a public employee with a property interest in continued employment, due process includes "a pretermination opportunity to respond, coupled with post-termination administrative procedures." *Id.* at 547-48. The "root requirement" of the Due Process Clause requires that "an individual be given the opportunity for a hearing *before* he is deprived of any significant property interest." *Id.* at 542 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). In so holding, the Supreme Court recognized the "severity of depriving a person of the means of livelihood" and that "[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Id.* at 543.

Appellants do not dispute that the Civil Service Commission denied Silberstein an opportunity to be heard, but argue that this did not constitute a due process violation because an adequate state corrective judicial process existed. Appellants' conclusion is in error. The rule requiring a § 1983 plaintiff to show the inadequacy of a state's post-deprivation corrective proceedings, articulated by the Supreme Court in *Parratt v. Taylor*, 451 U.S. 527 (1981), applies only where the deprivation complained of is random and unpredictable, such that the state cannot feasibly provide a predeprivation hearing. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *see also Moore v. Bd. of Educ.*, 134 F.3d 781, 785 (6th Cir. 1998) (applying *Zinermon* holding in circumstances factually analogous to present case); *Mitchell v. Fankhauser*, 375 F.3d 477, 481-84 (6th Cir. 2004) (reaffirming *Moore*). When a deprivation occurs through an established state procedure, "then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy," whereas when a random and unauthorized deprivation occurs, "the pre-deprivation procedures are simply impracticable and an adequate post-deprivation remedy affords all the process that is due." *Walsh v. Cuyahoga County*, 424 F.3d 510, 513 (6th Cir. 2005).

Silberstein was fired by an official action of the city's Civil Service Board after lengthy deliberation and consultation with attorneys. This was not a random, unauthorized deprivation, and Silberstein need not show that the state's post-deprivation corrective procedures were inadequate in order to allege adequately a deprivation of her due process rights.

## B. Whether Silberstein's rights were clearly established

Having concluded that Silberstein suffered a violation of her constitutional right to due process, we examine whether Silberstein's right was clearly established at the time of the deprivation, asking specifically whether it would have been clear to a reasonable person in the Board Members' position that their conduct was unlawful. *Saucier*, 533 U.S. at 201. The district court properly determined that Silberstein has satisfied this second half of the qualified immunity analysis.

At the time of Silberstein's termination in August 2002, Supreme Court precedent had clearly established that a pre-termination hearing is required before terminating an employee who holds a property interest in her employment, and also clearly established that statutes restricting the terms and procedures under which an employee may be terminated create such a property interest. *See Loudermill*, 470 U.S. at 541. However, the inquiry over whether a constitutional right is

"clearly established" must be undertaken in light of the specific context of the case, not as a broad general proposition. *Saucier*, 533 U.S. at 201. The Board Members do not dispute that a City of Dayton employee in the classified service had a clearly established right to a pre-termination hearing at the time of Silberstein's termination; rather, they argue that Silberstein's status as a classified employee is disputable such that a reasonable person would not know that he or she was violating Silberstein's rights.

At the time of Silberstein's termination, Ohio law clearly established that provisions of municipal charters should be given their plain meaning, *Eschen*, 656 N.E.2d at 944, and that unambiguous language must be applied faithfully in accordance with its plain meaning, *Roxane Labs., Inc.*, 661 N.E.2d at 1012. Ohio state court opinions had examined city charters to determine whether an employee is classified or unclassified, and in doing so had looked to the text of the provision listing the positions that constituted unclassified service. *See, e.g., Hart v. City of Fairborn*, 688 N.E.2d 1084, 1084 (Ohio Ct. App. 1996); *Goins v. Summit Co. Clerk of Courts*, No. 14796, 1991 WL 35129, at *1 (Ohio Ct. App. Mar. 6, 1991).

No reasonable official reading the plain language of the Charter would reach the conclusion that Silberstein was an unclassified employee. Although some cases reveal disagreement or ambiguity regarding an employee's status as classified or unclassified, these cases address whether an employee's position falls within the particular statutory language defining the categories of unclassified service. For example, in *Goins*, 1991 WL 35129, at *1, the court addressed whether a records clerk in a clerk of courts office fell within the state statute's unclassified service category of "deputies of clerks of the courts of common pleas who supervise, or who handle public moneys or secured documents," focusing on whether her position entailed handling public moneys and secured documents. No case contemplates the possibility that, where classified service is defined as all positions not specifically included within unclassified service, an unclassified position could still exist that does not fall under any of the specifically enumerated categories. Even Ohio's 1932 decision in *Kerr,* which found an unenumerated position to be unclassified under the city's charter, did so because the position was enumerated under state law. 181 N.E. at 547.

Silberstein's position was clearly established as classified not only by the plain language of the Charter but also by general understanding and practice. This court has held that a plaintiff satisfied the second prong of qualified immunity analysis by presenting evidence that for twenty-five years it had been generally understood that employees in his position were entitled to a hearing before their positions were terminated, and the defendant presented no evidence that he did not share such an understanding. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 567-68 (6th Cir. 2004). Numerous facts on the record demonstrate that Silberstein's position was generally understood to be classified. A former employee of the civil service who held the position of executive secretary had been disciplined as a classified employee and afforded all the protections granted to classified employees. The procedures Silberstein followed in applying for her job, namely, submitting a resume and a letter of application, were standard procedures for classified noncompetitive positions. In the early 1980s, legal opinions had been requested to clarify the status of the Secretary/Chief Examiner position – the position to which Silberstein had directly reported – and the legal opinions had concluded that the position was classified. The relatively low level of Silberstein's position on the management scale also indicated that it was a classified position. Subsequent to Silberstein's termination, a new position was created with duties substantially similar to hers with the title of Senior Manager of Test and Validation Services; this newly-created position was posted with a notation that the position was "Previously Assistant Chief Examiner," and was

posted as a classified position.[3]  In short, everything about the city's own treatment of Silberstein's position and other, similar positions within her division further supports the conclusion that the classification of Silberstein's Assistant Chief Examiner position was clearly established.  Taken in conjunction with the clear language of the Charter, the Board Members' argument that an objectively reasonable official could misunderstand Silberstein's employment classification is unpersuasive.

The Board Members also argue that their actions were objectively reasonable because they relied upon the advice of counsel that Silberstein was an unclassified employee.  This circuit has determined that reliance on counsel's legal advice constitutes a qualified immunity defense only under "extraordinary circumstances," and has never found that those circumstances were met.  *See Ross v. City of Memphis*, 423 F.3d 596, 603-04, 604 n.3 (6th Cir. 2005); *York v. Purkey*, No. 00-5650, 14 F. App'x 628, 633-34 (6th Cir. July 20, 2001).  The Board Members cannot cloak themselves in immunity simply by delegating their termination procedure decisions to their legal department, as the availability of such a defense would invite all government actors to shield themselves from § 1983 suits by first seeking self-serving legal memoranda before taking action that may violate a constitutional right.  *Cf. V-1 Oil Co. v. Wy. Dept. of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990) (stating that reliance upon counsel's advice cannot be "inherently extraordinary, for few things in government are more common than the receipt of legal advice").

There is no evidence that the Board Members' circumstances were in any way extraordinary.  The Board Members argue that they are not attorneys, but this fact alone cannot give rise to "extraordinary circumstances."  A reasonably competent public official is presumed to know the law governing his or her conduct.  *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).  The Board Members also argue that they were "very newly appointed" at the time of Silberstein's termination, and therefore their ignorance of Silberstein's employment classification was objectively reasonable.  The record reflects that Lindsey had been on the Board approximately seven months at the time of Silberstein's termination, and Grooms approximately three months.  The record also suggests that Toney had served on the Board longer than Lindsey or Grooms, but there is no indication of specifically how long she had served.  Given the collective experience of the Board, the clarity of the Charter's language, and the ample evidence of how positions such as Silberstein's had been treated in the past, we do not agree that these facts give rise to a conclusion that the Board Members could not be expected to know Silberstein's proper employment classification.

For all of the reasons set forth above, we conclude that the Board Members were not entitled to summary judgment on the basis of qualified immunity as to Silberstein's Fourteenth Amendment claim.

## IV.  Silberstein's First Amendment Claim

### A.  Whether Silberstein suffered a First Amendment Violation

The Board Members also argue on appeal that it was not clearly established at the time of Silberstein's termination that Silberstein's letter to the newspaper was constitutionally protected speech, and thus claim that they are entitled to summary judgment on the basis of qualified immunity.  We again engage in the two-step qualified immunity analysis, asking first whether the

---

[3] An affidavit by Grooms avers that the Board was not consulted before this new job was listed as classified, and the Board's opinion is that this job was and is an unclassified position.  Regardless of the Board's position on the matter, the fact that the job was originally listed as classified presumably reflects an understanding by someone employed by the city of Dayton that Silberstein's position was classified, further supporting an inference that it was generally understood to be so.

facts alleged by Silberstein, taken in the light most favorable to her, show the Board Members' conduct violated her right to free speech under the First Amendment. *Saucier*, 533 U.S. at 201.

To demonstrate First Amendment protection, a public employee must show (1) that the speech at issue addresses a matter of public concern, and (2) that the employer had no overriding state interest in efficient public service that would be undermined by the speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The district court opinion states that "defendants concede and this Court finds that Silberstein engaged in speech protected by the First Amendment" when she wrote and submitted her letter to the newspaper, and the opinion does not engage in any further analysis on the issue. In fact, however, although the appellants conceded in district court and on appeal that Silberstein's speech touched on a matter of public concern, they do not appear to have ever conceded that Silberstein's speech interest survives the *Pickering* balancing test.

We conclude that the district court erred in finding that Silberstein's letter was protected First Amendment speech. While *Pickering* provides the basic framework for analyzing a § 1983 First Amendment claim, this circuit employs a different test when a claim is brought by an employee who held a policymaking or confidential position. *See Rose v. Stephens*, 291 F.3d 917, 922 (6th Cir. 2002). In the cases of *Elrod v. Burns,* 427 U.S. 347, 367-68 (1976), and *Branti v. Finkel*, 445 U.S. 507, 518 (1980), the Supreme Court recognized an exception to the general prohibition against adverse employment actions on the basis of political patronage where an employee occupies a policymaking position. In *Rose v. Stephens*, this court applied the *Elrod/Branti* policymaking exception to a § 1983 First Amendment claim, holding that when an employee is in a policymaking or confidential position and is terminated for speech related to his or her political or policy views, there is a presumption that the *Pickering* balance favors the government. Thus, if Silberstein occupied a policymaking position as Assistant Chief Examiner, and if her letter to the editor related to her policy views, then her free speech interests presumptively lose out to the city of Dayton's interests in efficiently running its government.

In determining whether a government employee is in a policymaking or confidential position, the court looks to four distinct categories originally developed in the political patronage context in *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996). *See Rose*, 291 F.3d at 924; *see also Roupe v. Bay County*, 268 F. Supp. 2d 825, 831-32 (E.D. Mich. 2003). The categories include (1) positions specifically named in relevant law to which discretionary authority in carrying out law enforcement or political policy is granted; (2) positions to which a significant amount of category-one authority has been delegated, or positions not specifically named by law but inherently possessing category-one type authority; (3) confidential advisors to category-one position-holders; or (4) positions that are part of a group of positions filled by balancing out political party representation or by balancing out selections made by different government bodies. *Rose*, 291 F.3d at 924. In determining whether a public employee falls into one of the four *Testa* categories, this court looks at the inherent duties of the position rather than the actual tasks undertaken by the employee. *Latham v. Office of the Ohio Attorney Gen.*, 395 F.3d 261, 267 (6th Cir. 2005). A position need not fit perfectly into one of the "generic" categories in order to be a "confidential or policymaking" job. *Id.*; *Feeney v. Shipley*, 164 F.3d 311, 318 (6th Cir. 1999).

Silberstein's job duties appear to have been quite broadly defined: Her main duties entailed working on special projects – such as statistical analysis of the historical job retention among police and fire recruits, and field research on possible training and testing methods the Board might implement – and a host of widely varying day-to-day tasks, including taking minutes, preparing portions of annual reports, and proofreading tests to be given to police and fire recruits. Silberstein testified that she had very little direct interaction with the Board Members. However, although she apparently took it upon herself to author the report expressing her concerns about the practical implementation of the suggested diversity rules, she viewed this research to be part of her "duty" to the Board to provide them with sufficient information on which to base their decision about the

rule changes. In essence, Silberstein's work appears to have had the potential to substantially impact the daily implementation of the city's diversity policies.

As in *Latham*, Silberstein was "responsible for making important policy implementation recommendations to a policymaker," and her "inherent duties . . . [were] broad and limited primarily by the discretion of the policymaker." 395 F.3d at 269. We conclude that Silberstein was a policymaking employee commenting upon matters of policy, and we therefore apply the *Rose* presumption to conclude that government interests outweigh Silberstein's First Amendment interests. The Board's alleged retaliatory action therefore does not constitute a constitutional violation.

## B. Whether Silberstein's First Amendment rights were clearly established

Having found that no First Amendment violation occurred, we need not address the "clearly established" prong of the qualified immunity analysis. We therefore reverse the district court's denial of the defendants' motion for summary judgment on Silberstein's First Amendment claim.

## V. Conclusion

For the foregoing reasons, we affirm the district court's decision rejecting Grooms's, Lindsey's and Toney's Fourteenth Amendment qualified immunity defenses, but reverse the district court's decision rejecting Grooms's and Lindsey's First Amendment qualified immunity defenses. We therefore remand the case for further proceedings consistent with this opinion.