NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 14a0678n.06

Nos. 13-1320, 13-1399, 13-1765

**FILED**
Aug 28, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PATRICIA BARACHKOV, CAROL DIEHL, and NANCY ENGLAR, | ) ) ) | |
| Plaintiffs-Appellees/Cross-Appellants, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN |
| LINDA DAVIS, Chief Judge of the 41B District Court, individually and in her official capacity, | ) ) ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant/Cross-Appellee. | ) | |

BEFORE: COLE, Chief Judge; NORRIS and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** In July 2004, Linda Davis, Chief Judge of Michigan's 41B District Court, fired Patricia Barachkov, Nancy Englar, and Carol Diehl (collectively "the Employees"). The Employees filed suit against Davis in her individual and official capacities, alleging violations of their procedural due process rights under the Fourteenth Amendment. The case was tried to a jury, which returned a verdict in favor of the Employees and awarded compensatory and punitive damages. Davis appeals the denial of her motions for judgment as a matter of law, motion for a new trial, and motion to remit damages. For the following reasons, we hold that Davis is entitled to qualified immunity, vacate the award of damages against her, and remand for consideration of the Employees' entitlement to equitable relief.

**I.**

This case has been before this court once before.  In 2012, we heard an appeal from the district court's grant of Davis's motion for summary judgment, and while the factual record at trial supersedes the summary-judgment record, *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012), our prior opinion lays out some of the basic and undisputed factual background.

> [The] 41B District Court is a Michigan trial court assigned jurisdiction over traffic violations, civil and criminal infractions, small claims, and probation oversight. At times relevant to this case, 41B District Court was comprised of two physically separate divisions, one serving the city of Mt. Clemens, and the other serving Clinton Township. Each municipality was responsible for maintaining, financing and operating its respective division of the court.
>
> Appellants were employees of the Clinton Township division of the court until their terminations in July, 2004.  Appellants Barachkov and Englar were employed as court clerks, while Appellant Diehl was a court cashier.  During Appellants' employment, Linda Davis was Chief Judge of the 41B District Court and was assigned supervisory authority over personnel in both locations by law, and possessed the authority to hire, fire, discipline, or discharge employees.  Chief Judge Davis and Judge John Foster sat in the Mt. Clemens location, while Judge William Cannon sat in Clinton Township.

*Barachkov v. 41B Dist. Court*, 311 F. App'x 863, 865 (6th Cir. 2009).

Starting well before Davis's chief judgeship, Cannon was permitted almost unfettered discretion in formulating policy for the Clinton Township court location.  This included discretion to formulate a termination policy for court employees working in the Clinton location.[1]  Clinton Township first memorialized its personnel policies in the 1990s in the form of the Disciplinary Action Procedure ("DAP"), which provided in part for just-cause employment. Cannon was neither required to adopt the DAP nor did he implement it in its entirety.  He "used [his] own judgment and followed through on what [his] policy had always been since [he] was elected."  He testified that he applied the DAP to his employees to the extent it conformed to his

---

[1]Employees of the court were not Clinton Township employees.

preexisting policy, which was to provide notice, progressive discipline, and good cause for termination.

Cannon testified that his employees were aware that he employed a just-cause standard, in part because he told them so. He also testified that he circulated the DAP to his employees. The Employees testified that they received the DAP and understood themselves to be just-cause employees. Other employees executed affidavits attesting that they were at-will employees and there was additional testimony at trial that it was understood that Cannon maintained an at-will policy.

Davis became aware of the Clinton Township location's personnel policies in early 2004 when she participated in a comprehensive feasibility study into the merger of the Clinton Township and Mt. Clemens locations. A primary focus of the feasibility study was to determine 41B's human resources and personnel policies. Davis attended regular meetings about the potential merger with judges and representatives from the court locations, advisors from the townships, and Deborah Green from the State Court Administrator's Office ("SCAO"). At these meetings, the advisory board on which Davis sat requested personnel policies from Cannon and his representatives. Davis testified on both direct and cross examination that when personnel policies were requested of Cannon, his representatives, and the Clinton Township court location, the advisory board received nothing.

> Q: And as it related to that HR analysis, that personnel analysis, did you ask representatives from Clinton Township and the Clinton Township location for any union contracts that they had?
> A: We asked them for all contracts that they had.
> Q: So that would include individual employment contracts?
> A: Yeah.
> Q: And did you ask them for employee handbooks, policies and procedures?
> A: We asked them to give us all the policies and procedures and did the same thing with Mt. Clemens court so we could start meshing the two together.
> Q: Was that request made to each of the judges in each of the courts?

A: The judges were in the meetings where we made the requests. So it wasn't directly made to them, but they certainly were privy to it.

Q: And was that information requested from the administrators of each court, the chief judge, Judge Cannon and the court administrators.

A: Yes.

Q: And was that same information requested from the funding units from each of the courts?

A: Yes.

Q: Did you receive from the Clinton Township location a collective bargaining agreement?

A: No.

Q: Did you receive an employment contract?

A: No.

Q: Did you receive a written policies or procedures manual?

A: No.

Q: Did you receive any written policy or procedure regarding personnel issues, personnel management, just-cause employment status?

A: No. . . .

Q: Did you personally have discussions with Judge Cannon about those documents?

A: Yes.

Q: Did you personally have discussions with the HR representative from the township regarding those documents?

A: I did.

Q: Out of those discussions were any additional documentation or materials provided to you regarding the policies and procedures from that court?

A: None.

Q: Did you reach a conclusion as to whether the Clinton Township employees were at-will employees at that time?

A: Yes.

She testified: "We asked him, when we were doing the merger of the courts, what his policies and practices were, and he said he did not have any, that he didn't really have to discipline people very often at the township. So to my knowledge there were none."

Green, who was also present in the meetings, testified to the same.

Q: Did you look at personnel and staffing issues as it related to the consolidaiton?

A: Yes.

Q: Now, as it related to those personnel and staffing issues, would you have asked both courts for their personnel and staffing information as it relates to each court?

A: Yes.

Q: Did you ask that in Mt. Clemens?

-4-

Q: Yes.
Q: Did you ask that in Clinton Township?
A: Yes.
Q: And would you have made that request from Judge Cannon?
A: Yes. . . .
Q: And did you ask for personnel policies and procedures from Clinton Township?
A: Yes.
Q: Did you get it?
A: No.
Q: Did anybody give you an employee handbook of any kind?
A: No. I got one – I remember seeing one page or one or two pages about sick time and vacation time. I never saw anything more than that.
Q: Okay. Did you ever see a . . . personnel policy or procedure from anyone at Clinton Township?
A: No.
Q: Anyone describe to you during these meetings any kind of formal practice or informal practice that had been taking place at the Clinton Township court regarding personnel issues.
A: There was no formal practice.
Q: Okay. Did you reach a conclusion as it relates to the Clinton Township employees as to whether they were at-will employees?
A: I believe they were at will.

Based on the information collected during the feasibility study, both women concluded that

Cannon's employees served at will.

When the merger inquiry disclosed personnel problems, SCAO commenced a

management oversight review of 41B. We explained:

> In late May 2004, Deborah Green, a representative of the SCAO, informed Chief Judge Davis that the SCAO would soon be conducting a management oversight review into the operations and performance of the 41B District Court. On June 28, 2004, Chief Judge Davis held a staff meeting in which she advised the district court staff that, as part of the SCAO investigation, each employee of the court would be interviewed. At this meeting, Chief Judge Davis emphasized the serious nature of the investigation and that the need for honesty was paramount. She informed the employees that no one would be disciplined for previous wrongs, and that no one would lose their jobs if they were honest with the interviewer.

> Green independently interviewed each court employee; Chief Judge Davis did not participate in the investigation. Following completion of the interviews, Green concluded that Appellants Barachkov, Diehl, and Englar had lied and withheld information, and had coerced others to do the same. Appellants allege that their

answers to Green's questions were honest and that Green asked questions about topics on which they had no personal knowledge.

On July 15, 2004, Chief Judge Davis fired the Appellants. Along with a representative of the SCAO, Chief Judge Davis met individually with each Appellant and informed her that she was being terminated due to her responses during the interview. Appellants were not provided with advance notice of the terminations or a hearing in which they could dispute the reasons for their dismissal. Appellants contend that their terminations were a result of Chief Judge Davis' desire to advance her political and personal agenda by forcing Judge Cannon to retire, and that they were fired for failing to provide false information about Judge Cannon's management of the Clinton Township division of the 41B District Court. . . .

Appellant Barachkov commenced an action pursuant to § 1983 and various state laws in the United States District Court for the Eastern District of Michigan in October, 2004. Shortly after, Appellants Diehl and Englar followed suit and filed identical actions. On March 31, 2006, the district court consolidated the cases into a single action. Appellees thereafter filed motions for summary judgment alleging that Clinton Township and the 41B District Court were entitled to sovereign immunity and that Appellants could not, as a matter of law, establish any constitutional violations. The district court agreed and granted Appellees' motion.

*Barachkov*, 311 F. App'x at 865–66.

We reversed the district court's grant of summary judgment on the Employees' Fourteenth Amendment due process claim, holding that

there exists a direct conflict in the evidence regarding the exact contours of the termination policy—if any existed—employed by Judge Cannon, and whether such a policy was ever communicated to, and understood by, all of his employees. This is a genuine issue of material fact which requires further development of the record and cannot be properly resolved on summary judgment.

*Id*. at 872. We also reversed the district court's dismissal of the Employees' claim for prospective injunctive relief against Davis in her official capacity. *Id*. at 873.

On remand, the district court held that Davis was not entitled to qualified immunity because there was a fact question as to whether the Employees could be terminated only for just cause. The case proceeded to trial. Davis moved for judgment as a matter of law, which the

district court denied. Davis then requested a jury instruction on qualified immunity, which the district court denied, stating that Davis would be free to raise the issue post-verdict. The jury found in favor of the Employees and returned a verdict awarding compensatory and punitive damages in the amount of $2,277,688. Davis filed a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion to amend the judgment regarding damages, all of which the district court denied. Davis timely appealed. The Employees conditionally cross-appealed in the event the jury verdict is disturbed.

## II.

Davis was sued in her individual and official capacities. Qualified immunity shields a defendant sued in his or her individual capacity from monetary liability; it does not shield a defendant from official-capacity claims for equitable relief, *Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997), nor does it shield a defendant from individual-capacity claims for equitable relief, *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001). Because the Employees may be entitled to equitable relief notwithstanding the fact that Davis may be entitled to qualified immunity, we begin by considering whether the Employees' constitutional rights were violated.

## A.

Davis seeks reversal of the district court's denial of her motions for judgment as a matter of law and in the alternative for a new trial on the ground that the Employees could not establish a violation of their constitutional rights. We review *de novo* a district court's denial of a motion for judgment as a matter of law, applying the same deferential standard as the district court. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). "'District courts should grant judgment as a matter of law only if a complete absence of proof exists on a material issue in the action, or if no disputed issue of fact exists on which reasonable minds could differ.'"

*Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004) (quoting *LaPerriere v. Int'l Union UAW*, 348 F.3d 127, 132 (6th Cir. 2003)). We view the evidence in the light most favorable to the non-moving party. *Radvansky*, 496 F.3d at 614. "Neither the district court nor the reviewing court may reweigh the evidence or assess the credibility of witnesses." *Id.*

A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Id.* We will reverse only if we have "'a definite and firm conviction that the trial court committed a clear error of judgment.'" *Id.* (quoting *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000)).

**1.**

The focus of Davis's appeal is the district court's conclusion that the Employees adduced sufficient evidence of a property interest protected by the Due Process Clause.[2] At the outset, to the extent that Davis argues that the Employees' evidence could not establish a property interest a matter of law, this issue was decided by our prior opinion in this case. *Barachkov*, 311 F. App'x at 872. What remains for our consideration in this appeal is a question of evidentiary sufficiency: whether the Employees adduced sufficient evidence from which a reasonable juror could conclude that the Employees had an interest protected by the Due Process Clause.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank &*

---

[2]Davis also asserts that she is entitled to judgment as a matter of law because the Employees failed to plead the inadequacy of state remedies. In 2004, we clarified that a plaintiff only needs to plead the inadequacy of state remedies when the deprivation is the result of random or unauthorized state action. *Mitchell v. Fankhauser*, 375 F.3d 477, 483–84 (6th Cir. 2004); *see also Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 649–50 (6th Cir. 2013). Davis's acts were neither random nor unauthorized. The Employees were therefore not required to plead or prove the inadequacy of post-termination, state-law remedies. *See Mitchell*, 375 F.3d at 484.

*Trust Co.*, 339 U.S. 306, 313 (1950)). There are two components to a procedural due process claim: whether a protected interest exists and whether, if that interest exists, constitutionally sufficient procedures were used to protect that interest. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004). This dispute centers on whether the Employees had a property interest in continued employment.

The Employees claim that Cannon's policies created a contract implied at law for just-cause employment by instilling a legitimate expectation of continued employment. Just-cause employment is a cognizable property interest, *Barachkov*, 311 F. App'x at 871 (citing *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004)), and Michigan recognizes a legitimate-expectation theory as one way to establish just-cause employment, *see Singfield*, 389 F.3d at 565 (property interests are defined, *inter alia*, by state law). "Generally, and under Michigan law by presumption, employment relationships are terminable at the will of either party." *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998). Michigan courts apply a two-step inquiry to evaluate legitimate-expectations claims. *Id*. First, the court determines what the employer promised. *Id*. Second, the court determines "whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment." *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 607 (Mich. 1993).

Certain promises do not suffice. "[O]nly policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id*. The fact that an employer follows a disciplinary system is not alone enough to establish just-cause employment. *Biggs v. Hilton Hotel Corp.*, 486 N.W.2d 61, 62–63 (Mich. Ct. App. 1992). And "[a] lack of specificity of policy terms or provisions, or a policy to act in a particular manner as long as the employer so chooses, is grounds to defeat any claim that a recognizable promise in fact has been made."

*Lytle*, 579 N.W.2d at 911. Finally, the policy must be communicated "'to the work force in general or to specific classifications of the work force, rather than an individual employee.'" *Rood*, 507 N.W.2d at 606 n.3 (quoting *Bankey v. Storer Broad. Co.*, 443 N.W.2d 112, 114 n.3 (Mich. 1989)). "[A] mere subjective expectation on the part of an employee is insufficient to create a jury question as to whether an employment contract may be terminated only for just cause." *Grow v. Gen. Prods., Inc.*, 457 N.W.2d 167, 169 (Mich. Ct. App. 1990).

As relates to this appeal, the question before the jury was whether Cannon communicated his just-cause policy to the workforce in general. *Rood*, 507 N.W.2d at 607. Davis attempts to retry this issue, pointing to evidence from which we could conclude that Cannon did not disseminate his policy to the workforce at large. But the fact remains that there was ample evidence to the contrary.

Cannon testified:

> Q: Now this practice that you had adopted, did anyone compel you to adopt that practice?
> A: No.
> Q: And you said you didn't document that practice in any way. Did you circulate the fact that that was your practice to anybody?
> A: Oh the employees knew.
> Q: The employees knew?
> A: Sure?
> Q: How did they know?
> A: I told them. . . .
> Q: Now let's talk about your practice, You said the employees knew about your practice. How did they know about your practice?
> A: I told them.
> Q: When did you do that?
> A: At meetings and if they asked me individually, I explained it to them. Which didn't happen very often. But certainly at meetings it was discussed. Not at great lengths or every meeting or anything like that, but they understood what the policy was and if they say they didn't—because Deborah Green would say that[—it] would be disingenuous."

Cannon also testified that he circulated the DAP to employees, consistent with the fact that the DAP mirrored his policies.

The Employees testified that it was understood that Cannon adopted a just-cause standard and that they had received the DAP. Monica Sylvester, a former court employee, also testified that Cannon informed court employees that they followed Clinton Township's personnel policies, including a just-cause standard.

Viewing this evidence in the light most favorable to the Employees, there is sufficient evidence from which a reasonable juror could conclude that the Employees had a legitimate expectation of just-cause employment. Accordingly, because it is undisputed that the Employees received no pre-termination process, they have established that their constitutional rights were violated. *See Loudermill*, 470 U.S. at 542–43.

**B.**

A defendant sued in his or her individual capacity enjoys immunity from civil damages unless the defendant's conduct violated a clearly established constitutional right. *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013). Whether a defendant official is entitled to qualified immunity is a question we review *de novo*. *Id*. at 693.

We have, at times, elaborated a three-part qualified-immunity standard. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*). After determining whether a constitutional violation occurred and whether the constitutional right was clearly established, we consider whether "what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Id*. This third requirement is implicit in the two-part framework and flows from *Saucier v. Katz*, 533 U.S. 194, 205 (2001). *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005). In a procedural due process case such as this, the relevant inquiry is whether a reasonable official would have known that terminating the Employees

without a pre-termination hearing was unlawful. *See Silberstein v. City of Dayton*, 440 F.3d 306, 316–18 (6th Cir. 2006); *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 896–97 (6th Cir. 2006).

The Employees dispute this characterization of the law. They assert that the qualified immunity analysis has two parts and that there is no inquiry into the reasonableness of the Davis's conduct in light of the facts confronting her. The Employees maintain that "no reasonable official could misunderstand the need to provide process to a just-cause employee" and that it is irrelevant whether Davis was objectively reasonable in concluding that the Employees served at will.

For this proposition, the Employees rely on *Pucci v. Nineteenth District Court*, 628 F.3d 752 (6th Cir. 2010). There, Julie Pucci was terminated from her administrative position at a Michigan court and brought a procedural due process claim against Somers, the court's chief judge. *Id*. at 755. On the issue of qualified immunity, we held: "Obviously, if Pucci is ultimately found to have a property interest in her employment, her right to at least some pre-termination process was clearly established. Since she received no process, Somers is not entitled to qualified immunity." *Id*. at 767. There was no discussion of whether Somers was objectively unreasonable in concluding that Pucci was an at-will employee.

But that there was no analysis of this element of the qualified-immunity standard in *Pucci*, in the factual context of that case, does not mean that *Pucci* fundamentally altered our qualified-immunity analysis. Indeed, *Pucci* applied the framework set out in *Silberstein*, where we observed that "the inquiry over whether a constitutional right is 'clearly established' must be undertaken in light of the specific context of the case, not as a broad general proposition." 440 F.3d at 316 (citing *Saucier*, 533 U.S. at 201). There, the officials' qualified-immunity

defense relied exclusively on the argument that a reasonable official in their positions would not have known that Silberstein was entitled to a pre-termination hearing. *Id.* at 316.

> The Board Members do not dispute that a City of Dayton employee in the classified service had a clearly established right to a pre-termination hearing at the time of Silberstein's termination; rather, they argue that Silberstein's status as a classified employee is disputable such that a reasonable person would not know that he or she was violating Silberstein's rights.

*Id.* Canvassing the facts as they would have appeared to a reasonable official, we held "the [officials'] argument that an objectively reasonable official could misunderstand Silberstein's employment [status was] unpersuasive," as "Silberstein's position was clearly established." *Id.* at 317.

*Silberstein* and in turn *Pucci* thus reflect well-established qualified-immunity law. The "'objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011); *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (same); *see also Rodgers*, 529 F. App'x at 651 ("The district court erred, however, by failing to consider whether a reasonable official in [defendant's] position would have understood that she was violating the plaintiffs' constitutional rights in light of the circumstances at the time."). Again, the relevant inquiry in a procedural due process case is whether a reasonable official would have known that terminating the Employees without a pre-termination hearing was unlawful. *See Silberstein*, 440 F.3d at 316–18; *Miller*, 448 F.3d 887 at 896–97. Thus, we turn to whether Davis was objectively unreasonable, based on the circumstances confronting her, in concluding that the Employees served at will.

We hold that she was not. As discussed above, beginning in early 2004, a few months before Davis terminated the Employees, she personally participated in a feasibility study into the merger of the 41B District Court locations designed in large part to determine the personnel policies at each location. Davis attended regular meetings about the potential merger. At those meetings, both Cannon and his representatives from the Clinton Township location were asked to provide any personnel policies pertaining to Cannon's employees. Davis received nothing from Cannon, his representatives, or the Clinton Township location to suggest that the Employees were anything other than at-will employees. Indeed, Davis testified: "We asked [Cannon], when we were doing the merger of the courts, what his policies and practices were, and he said he did not have any, that he didn't really have to discipline people very often at the township. So to my knowledge there were none."

Based on the undisputed facts confronting her, Davis made an objectively reasonable determination that the Employees served at will. The default status for court employees was at-will employment. For the Employees to be just-cause employees, Cannon would have had to affirmatively adopt that policy. On request for personnel policies, a matter of considerable import, a reasonable official could expect to receive a written policy and, at the very least, a reasonable official in Davis's position would have expected Cannon to inform her of his non-written policy when the issue was broached. Davis's personal participation in the feasibility study, a measure designed in part to determine the status of court employees, was an adequate "precautionary measure[.]" *Miller*, 448 F.3d at 897.

Nor was Davis objectively unreasonable, as the district court suggested, because she did not re-determine the Employees' status in the period between when the feasibility inquiry was conducted and their terminations. The feasibility study was conducted at some point at the

beginning of 2004. Davis terminated the Employees in July 2004. It was not objectively unreasonable to conclude that the status of the Employees did not change between the beginning of 2004 and July of that year, absent some reason to believe it had changed.

The Employees make numerous contrary arguments, none of which is availing. Englar testified that she told Davis at her termination that she was a just-cause employee. But Davis was not objectively unreasonable in relying on information collected from the policymakers rather than the employee being terminated. The Employees also argue that Davis was aware of a Michigan Supreme Court administrative order requiring courts to mirror as closely as possible the personnel policies of their respective funding units. Because the Clinton Township location's funding unit was a just-cause employer, the Employees contend Davis should have known that the Employees could be fired only for just cause. The district court rejected this argument unequivocally and we agree: "[T]he proposed conclusion does not follow as a matter of fact, or law, because despite this administrative order, it was undisputed at trial that 'at the end of the day' Judge Cannon was permitted to develop his own personnel policies."

The Employees argue that Green established that it was prevailing common knowledge among Cannon's staff that Cannon had a just-cause policy. Whether this was common knowledge among Cannon's staff is beside the point; what matters is whether the policy was known to the extent that a reasonable person in Davis's position would have been aware of its existence. *See, e.g.*, *Silberstein*, 440 F.3d at 306 ("This court has held that a plaintiff satisfied the second prong of qualified immunity analysis by presenting evidence that for twenty-five years it had been generally understood that employees in his position were entitled to a hearing before their positions were terminated, and the defendant presented no evidence that he did not share such an understanding." (citing *Singfield*, 389 F.3d at 567–68)). Davis presented evidence that

she did not share such an understanding and that she reasonably undertook to determine the Employees' employment status. Davis was not objectively unreasonable in crediting the information collected from the investigation, including from Cannon himself, over a contested assertion that Cannon's employment policies were common knowledge to his employees.

The district court erred in denying Davis qualified immunity.

## III.

The Employees cross-appeal the district court's dismissal of 41B as a defendant, contending that 41B's litigation conduct waived its Eleventh Amendment sovereign immunity.[3] "Whether sovereign immunity exists is a question of constitutional law," which we review *de novo*. *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).

Sovereign immunity is a quasi-jurisdictional doctrine, under which "[a] State remains free to waive its Eleventh Amendment immunity from suit in a federal court." *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002)). A state may waive its immunity through its litigation conduct; but the touchstone of waiver doctrine is intent—the state's litigation conduct must clearly indicate the state's intent to waive its immunity. *Id.* at 620. A clear intent to waive immunity may be inferred when a state's litigation conduct is inconsistent and unfair. *Id.* Waiver doctrine thus prevents the state from gaining an unfair litigation advantage by prohibiting a state from testing the waters with respect to the merits of its claim only to assert sovereign immunity once it believes its claim will fail. That is, a state waives its sovereign immunity where its dilatory assertion of immunity is a "tactical decision." *In re Bliemeister*, 296 F.3d 858, 862 (9th Cir. 2002); *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 763 (9th Cir. 1999) ("The Eleventh Amendment was never intended to allow a state to

---

[3]The Employees abandon any argument that Clinton Township was improperly dismissed.

appear in federal court and actively litigate the case on the merits, and only later belatedly assert its immunity from suit in order to avoid an adverse result."); *see also Lapides*, 535 U.S. at 620 (characterizing a purpose of the doctrine constructive-waiver doctrine as prohibiting states from selectively using immunity "to achieve litigation advantages").

Waiver is a case-specific inquiry, focused on the course of a state's litigation conduct. For example, this court has held that where a state loses its case on the merits after extensive discovery, a state may not then claim sovereign immunity. *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003). Likewise, the Ninth Circuit has held that a state waived its sovereign immunity when it filed a limited response, an answer, and a motion for summary judgment; attended an oral hearing and argued the merits; and heard the court announce its preliminary leanings, all without raising its sovereign immunity. *See Bliemeister*, 296 F.3d at 862 ("To allow a state to assert sovereign immunity after listening to a court's substantive comments on the merits of a case would give the state an unfair advantage when litigating suits."); *see also Hill*, 179 F.3d at 756–58, 760–63 (holding state waived sovereign immunity when it did not raise it until the opening day of trial, after it had filed two motions to dismiss and an answer that did not assert it, consented to have a magistrate try the case, conducted discovery, moved to compel discovery and for sanctions, participated in a pre-trial conference, and filed trial material).

The Employees argue that 41B waived its sovereign immunity by asserting the defense primarily in its summary-judgment reply brief. We have never held that the failure to raise sovereign immunity in an opening summary-judgment brief *per se* constitutes a waiver. Rather, properly focusing on the whole of 41B's litigation conduct demonstrates that it did not clearly intend to waive its sovereign immunity and consent to federal jurisdiction.

41B first raised the issue of sovereign immunity in its answer to the complaint and again in its amended affirmative defenses. While 41B did not file a Rule 12(b)(1) motion to dismiss on sovereign immunity grounds, neither did it file a motion to dismiss on the merits. Less than two months later, 41B filed its summary-judgment brief where it failed to raise its sovereign immunity. Three weeks after Barachkov filed her response, 41B reasserted its sovereign immunity in its reply. Thus, while 41B did not file a motion to dismiss and did not raise its immunity in its initial summary-judgment brief, neither does 41B's somewhat belated assertion of sovereign immunity appear to be a strategic decision. 41B raised sovereign immunity in its summary judgment briefing and, importantly, raised it before the district court had ruled on the merits of the case. 41B's litigation conduct was neither unfair nor inconsistent, and it cannot be said that its dilatory assertion of sovereign immunity was but a tactical decision. *Cf. Ku*, 322 F.3d at 435. 41B has not clearly indicated its consent to federal jurisdiction and thus has not waived its sovereign immunity.

## IV.

Although the district court correctly found that there was sufficient basis for the jury to conclude that the Employees were in fact just-cause employees, the award of damages cannot stand because the district court erred in determining that Davis was not entitled to qualified immunity. Accordingly, we vacate the award of damages. We remand to the district court to determine the Employees' entitlement to equitable relief. And we affirm the district court's judgment holding that 41B was entitled to sovereign immunity.