RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0380p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JULIE PUCCI,

        *Plaintiff-Appellee,*

    *v.*

NINETEENTH DISTRICT COURT, for the City of
Dearborn; CHIEF JUDGE MARK W. SOMERS,
in his official and individual capacities,
        *Defendants-Appellants.*

No. 08-2017

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10631—David M. Lawson, District Judge.

Argued: October 16, 2009

Decided and Filed: December 16, 2010

Before: BATCHELDER, Chief Judge; GIBBONS, Circuit Judge; MALONEY, Chief
District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Margaret A. Nelson, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellants. Joel B. Sklar, Detroit, Michigan, for
Appellee. **ON BRIEF:** Karen K. Kuchek, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellants. Joel B. Sklar, Sanford Plotkin, Detroit,
Michigan, for Appellee.

———————————

## OPINION

———————————

    JULIA SMITH GIBBONS, Circuit Judge. This case involves the termination of

plaintiff Julie Pucci from her administrative position in the Nineteenth District Court,

---

[*] The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of
Michigan, sitting by designation.

a court within Michigan's state judicial system. Pucci has brought suit against both the court and Mark Somers, the court's chief judge at the time of Pucci's termination. Pucci claims that she was terminated in retaliation for her complaints to state court officials about Somers's use of religious language from the bench, in violation of her right to free speech. She also alleges her termination violated her right to due process because she had a property interest in continued court employment. The district court granted in part and denied in part the defendants' motion for summary judgment. The defendants now appeal, claiming they are entitled to sovereign immunity and that Pucci has no due process claim because she had no constitutionally cognizable interest in her continued employment. Somers also appeals on the ground that he is entitled to qualified immunity.

For reasons set forth below, we find that both defendants are entitled to immunity under the Eleventh Amendment, and we therefore reverse the district court's denial of summary judgment as to the Nineteenth District Court and Somers in his official capacity. We also find Somers is not entitled to qualified immunity with respect to Pucci's free speech and due process claims, and we therefore affirm the district court's denial of qualified immunity to Somers in his personal capacity.

I.

The Michigan Supreme Court oversees administration of Michigan's courts, and the chief justice of the Michigan Supreme Court serves as the head of the state judiciary. Mich. Comp. Laws §§ 600.152, 600.219. The Michigan Supreme Court issues rules, administrative orders, and a code of judicial conduct that affects all Michigan judges. The Supreme Court Administrative Office oversees the administration of Michigan's courts, including the Michigan unitary district court, of which the Nineteenth District Court is one division.

The Nineteenth District Court is a "third class" district court consisting of three judges and serving Dearborn, Michigan. Mich. Comp. Laws § 600.8121(4). The City of Dearborn is the court's local funding unit and "is responsible for maintaining, financing and operating the district court." Mich. Comp. Laws § 600.8103(3). Although

the court constitutes its own administrative unit, the Michigan Supreme Court has supervisory authority over the court. *See* Mich. Comp. Laws § 600.8101(1) ("The state is divided into judicial districts of the district court each of which is an administrative unit subject to the superintending control of the supreme court."). The chief district judge, who is appointed for two-year terms by the Michigan Supreme Court, has the authority to perform all administrative duties, including hiring and firing court employees. *See* Mich. Ct. R. 8.110(B), 8.110(C)(3).

Julie Pucci began working at the Nineteenth District Court as a court typist in 1991. She was promoted to probation officer in 1991, judicial aide in 1992, clerk of the court in 1994, and assistant court administrator in 1995. The last position was reclassified in 1998 as "deputy court administrator," and Pucci held this position until she was terminated in 2006. While deputy court administrator, Pucci became romantically involved with Judge William Hultgren, a district judge on the Nineteenth District Court. The relationship began in 2001, and the two eventually began living together. The relationship apparently did not factor into the court's operations until the appellant, Mark Somers, was elected district judge.

After Somers's election in 2003, the Nineteenth District Court comprised Judges Hultgren, Somers, and Richard Wygonik. The Michigan Supreme Court declined to appoint any of these three to the position of chief district judge and instead appointed Judge Leo Foran, a judge from a neighboring district court, to that post. Foran served as chief district judge from March 2005 until January 2006, when the Michigan Supreme Court appointed Somers chief district judge.[1]

Initially, Pucci worked as deputy court administrator without incident and received good employment evaluations. In 2004, however, she lodged a complaint with her supervisor, the court administrator, regarding Somers's "practice of interjecting his personal religious beliefs into judicial proceedings and the business of the court." *Pucci*

---

[1]Both parties—and Foran—acknowledge that the relationship between "Hultgren and Somers was acrimonious, although it is unclear when that bitterness developed." *See Pucci v. 19th Dist. Court*, 565 F. Supp. 2d 792, 797 (E.D. Mich. 2008).

*v. 19th Dist. Court*, 565 F. Supp. 2d 792, 797 (E.D. Mich. 2008).  She also complained to the regional court administrator and to the State Court Administrative Officer (SCAO), which oversees the administration of Michigan's courts.  Pucci was not alone in complaining.  Sharon Langen, the clerk of the court, also testified that she complained to the SCAO, and another court employee filed a complaint with the state judicial tenure commission.  Foran stated that, during his brief ten-month tenure as chief district judge, he received upwards of fifteen complaints from local attorneys "about Judge Somers interjecting his religious beliefs from the bench or imposing sentences based on religion."  *Id.*  The record provides several examples:

> Judge Somers used official court stationary on three separate occasions to send official correspondence affixing a quote from a biblical passage[;] . . . [according to Foran,] a "Muslim boy got a stiffer sentence . . . because of the fact that whatever offense he had, it happened during Ramadan[]"; [o]thers complained that Judge Somers lectured defendants about marijuana, declaring that it was the devil's weed or Satan's surge, and that he would ask litigants in court if they go to church.

*Id.*  In response, the regional court administrator instructed Somers to stop using court stationary to send religious messages.  Hultgren claims he told Somers that Pucci had complained about the religious statements in February 2005.

Meanwhile, Foran decided to reorganize the Nineteenth District Court's administrative structure.  On March 30, 2005, he announced his intent to replace the retiring court administrator with Pucci and not fill the resulting absent deputy-court-administrator position.  Foran explained, "[Pucci] was doing the job as court administrator anyway.  She was accepted, highly regarded, and respected by any attorney that ever talked to me about her and highly respected and regarded in the community at large."  *Id.*  Somers objected to Pucci's planned promotion, arguing that her and Hultgren's relationship created "an inherent conflict."  *Id.* at 798.

Somers then began to lobby for Pucci's termination as a court employee.  On March 31, 2005, Somers wrote Foran about "pointed conversations" between Somers and Hultgren regarding Pucci's potential promotion.  Somers stated that Hultgren believed his relationship with Pucci should not prevent his own appointment to chief

judge or Pucci's planned promotion. Somers alleged, "Judge Hultgren has gone so far as to tell me that this is 'personal' to him, [and] that he will never support me for the chief judge position if I oppose Ms. Pucci's appointment to court administrator . . . ." *Id.* Somers also suggested that the Michigan Supreme Court's anti-nepotism policy should apply to Pucci's court employment and "implore[d Foran] to prevail upon [Hultgren] and explain the impossibility of his position in this matter." *Id.* Foran declined, responding that he had "informed the control unit" that Pucci would succeed the outgoing court administrator. *Id.*

Somers again objected to Pucci's appointment on April 5, 2005. Writing to his fellow Nineteenth District Court judges, he argued that "without the courtesy of consultation or discussion, Ms. Pucci's appointment is presented as a *fait accompli*. . . . [T]he integrity of this court [is] at stake." *Id.* at 799. Somers warned he would "test[] the legality of this appointment under the Supreme Court's anti-nepotism policy . . . and the Cannons [sic]." *Id.* Nine days later, he lodged a challenge with the regional court administrator, asking her to reverse Pucci's appointment. He then sent a letter to the state court administrator, Carl Gromek, seeking to rescind the appointment, remove Foran as chief judge, and amend the court's anti-nepotism policy to include "domestic partners."[2]

Pucci was appointed interim court administrator on May 5, 2005. Soon thereafter, however, Gromek sent Foran a letter, which stated:

> I referred this matter to the Court, and the Justices have concluded that Ms. Julie A. Pucci's romantic partnership with Judge Hultgren is a violation of the spirit of its antinepotism rule. While the Court is of the view that Ms. Pucci may remain employed with the 19th District Court in the capacity that predated her romantic relationship with Judge Hultgren, she cannot be advanced or otherwise be advantaged after the beginning of her romantic relationship with Judge Hultgren. Accordingly, Ms. Pucci will not succeed Doyne E. Jackson as Court Administrator.

---

[2]The anti-nepotism policy in place at the time, Administrative Order No. 1996-11, stated: "Relatives of . . . judges or court administrators shall not be employed within the same court." "Relatives" included a variety of relationships, including spouse, but not live-in partner.

*Id.* In light of the letter, Foran appointed Langen to court administrator and maintained Pucci as deputy court administrator. He did not fill the clerk of court position made vacant by Langen's elevation. This arrangement continued to Foran's satisfaction and without complaint from the court staff or community until Somers became chief district judge on January 1, 2006.

Coinciding with his elevation to chief district judge, Somers began to evaluate the performance of the administrative staff. He particularly questioned Langen's ability to fulfill her duties as court administrator. On June 12, 2006, Somers began inquiring with the regional court administer, Deborah Green, about changing the Nineteenth District Court's personnel structure. Green followed up via email on July 21, 2006:

> [Y]ou might want to inquire as to when Julie [Pucci] is eligible for retirement. You asked about possible legal ramifications, and if my memory serves Dearborn has an "all or nothing" retirement system that I thought Julie was very close to vesting in. Terminating her on the eve of her vesting might be seen as suspect if she sues. If she vests it might also give you and she a graceful way out.

*Id.* at 800. Somers ignored this advice and announced his reorganization plan on October 10, 2006. Langen would return to her former position as clerk of the court as soon as a new person could fill the court administrator position.[3] The deputy court administrator position would be eliminated, and, effective January 1, 2007, Pucci would be terminated.

Pucci lost her position without a hearing or other review process following the announcement of her termination in a memorandum. She had assumed (and maintains today), however, that she could only be fired for cause. Although no longer a labor union member, Pucci never signed the "at-will" employment agreement that some other court employees signed. She claims that the Nineteenth District Court, which has no employment manual or policies, has in practice followed those of the City of Dearborn.

---

[3]Somers hired Gary Dodge as the next court administrator. Somers admits that Dodge's uncle is a member of Somers's Kiwanis Club. Dodge admitted that he previously worked as a court administrator in Chicago but lost his position because the judges "couldn't work with [him] anymore" and "didn't trust [him]." *Pucci*, 565 F. Supp. 2d at 801. Pucci points out that Dodge has no college degree and no experience in Michigan courts. Dodge was hired as a "just cause" employee.

Pucci also notes Dearborn's "progressive" employment policies and two prior incidents in which court employees were terminated and given generous severance packages in exchange for signing waivers of their respective employment rights.[4]

Pucci also testified that Somers told her that her termination was due to her relationship with Hultgren and not due to budgetary concerns.[5]  Somers denies any illegal motive in his termination of Pucci.  His stated reasons for Pucci's firing are "dissatisfaction with her job performance" and the implementation of "the same organizational plan that was already in the works under Judges Foran and Hultgren before the Michigan Supreme Court intervened with regard to Ms. Pucci's promotion." *Pucci*, 565 F. Supp. 2d at 801 (internal quotation marks omitted).  Foran disagreed and testified that he thought Somers terminated Pucci for personal reasons and because of her unmarried relationship with Hultgren.

On February 12, 2007, Pucci filed suit against Somers, the Nineteenth District Court, and the City of Dearborn.  She alleged a 42 U.S.C. § 1983 violation of her due process rights; claims of religious, marital-status, and sex discrimination under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*; and a claim of discrimination in violation of The Whistleblowers' Protection Act, Mich. Comp. Laws § 15.361 *et seq.*  Pucci subsequently amended her complaint twice,[6] adding a First Amendment retaliation claim under § 1983 and a similar claim under the Elliot-Larsen Civil Rights Act.  The defendants filed a motion for summary judgment on all counts, and the parties stipulated to the dismissal of the marital-status discrimination claim and to the dismissal of all claims against the City of Dearborn.

---

[4]Somers declined Pucci's request for a severance package.  He initially offered to compensate Pucci for half of her sick days, but rescinded the offer once Pucci took a position with the City of Dearborn.

[5]Additionally, Pucci claims that her position, deputy court administrator, was never eliminated and that Somers instructed human resources on January 19, 2007, not to eliminate the "Deputy Court Administrator" classification at that time.

[6]In its order and opinion on the defendants' motion for summary judgment, the district court ordered Pucci to file a third amended complaint "to clarify her free speech retaliation claim."  Pucci did so, but that complaint is not before us on appeal. We address only the claims raised in the second amended complaint and addressed by the district court's opinion. *See Pucci*, 565 F. Supp. 2d at 811.

The district court rejected the defendants' argument that the Eleventh Amendment provides the Nineteenth District Court and Somers in his official capacity with immunity from Pucci's federal § 1983 claims. It concluded that because the City of Dearborn, as the Nineteenth District Court's local funding unit, is liable for any money judgment against the defendants, the court is not a state entity entitled to state sovereign immunity. *Pucci*, 565 F. Supp. 2d at 803–05. The district court also found that Pucci raised sufficient evidence of retaliation and due process violations to survive summary judgment. *Id.* at 808, 810. The defendants filed a timely interlocutory appeal challenging the district court's denials of sovereign and qualified immunity.

## II.

This court reviews a district court's grant of summary judgment *de novo*. *Equitable Life Assurance Soc'y v. Pope*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). All evidence and reasonable inferences "must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (citation and quotation marks omitted).

## III.

States and the federal government "possess[] certain immunities from suit in state and federal courts." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (*en banc*). "This immunity flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution and applies to claims against a State by citizens of the same State, claims against a State by citizens of another State, and actions against state officials sued in their official capacity for money damages." *Barachkov v.*

*41B Dist. Court*, 311 F. App'x 863, 866–67 (6th Cir. 2009) (quoting *Ernst*, 427 F.3d at 358) (internal quotation marks omitted). However, this sovereign immunity does not extend to an entity that is not an "arm of the state," including municipal and county entities, or "if the lawsuit is filed against a state official for purely injunctive relief enjoining the official from violating federal law." *Ernst*, 427 F.3d at 358 (citations omitted); *see also Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, 610 F.3d 321, 325 (6th Cir. 2010).

This court has laid out the factors that courts should consider when determining, for sovereign-immunity purposes, "whether an entity is an 'arm of the State' on the one hand or a 'political subdivision' on the other." *See Ernst*, 427 F.3d at 359. Those factors are:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Id.* (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44, 45, 51 (1994)); *see also Lowe*, 610 F.3d at 325. Relying on the "potential liability" factor as the "most important factor," the district court found that because Dearborn would be financially liable for any judgment against the Nineteenth District Court, sovereign immunity was inappropriate. *Pucci*, 565 F. Supp. 2d at 804–05. The district court declined to follow two prior opinions from the United States District Court for the Eastern District of Michigan holding that Michigan's district courts are an arm of the state and entitled to sovereign immunity because those decisions did not give adequate weight to the financial-liability factor. *See id.* at 803–04 (discussing *Englar v. 41B Dist. Court*, Nos. 04-cv-73977/04-cv-73957, 2006 WL 2726986 (E.D. Mich. Sept. 22, 2006), *aff'd in part and rev'd in part, sub nom. Barachkov v. 41B Dist. Court*, 311 F. App'x 863 (6th Cir. 2009), *and Geller v. Washtenaw County*, No. 04-72947, 2005 WL 3556247 (E.D. Mich.

Dec. 29, 2005)).[7]  Since the district court issued its opinion, federal district courts in Michigan have found that sovereign immunity attaches to two other Michigan courts—one district and the other circuit.  *See Dolan v. City of Ann Arbor*, 666 F. Supp. 2d 754, 760–65 (E.D. Mich. 2009) (finding the Fifteenth District Court entitled to qualified immunity); *Borghese v. Autman*, No. 1:09-CV-651, 2009 WL 3498798, at *1 (W.D. Mich. Oct. 26, 2009) (finding without discussion that the family division of the Seventeenth Circuit Court is entitled to sovereign immunity); *see also Turppa v. Cnty. of Montmorency*, — F. Supp. 2d —, 2010 WL 2813208, at *1 (E.D. Mich. July 14, 2010) (noting that "there is some degree of probability that the probate court is immune from suit as an arm of the state" (citations omitted)).

In concluding that potential financial liability is the only determinative factor—or the near-determinative factor—in establishing whether a state court is an arm of the state for purposes of Eleventh Amendment sovereign immunity, the district court strayed from the appropriate analysis of taking the other factors into account.  In the case of Michigan's trial-level district courts, the other three factors far outweigh the fact that local funding units such as Dearborn may bear the financial repercussions of a lawsuit filed against a district court, its judges, or its employees.[8]

This court, *en banc*, has clarified that "[w]hile there can be little doubt that the state-treasury inquiry will *generally* be the most important [factor], it also seems clear

---

[7]The United States District Court for the Western District of Michigan had also by this time found that "Michigan district courts are entitled to sovereign immunity because they also serve as Michigan's 'adjudicative voice,' are authorized under the Michigan Constitution, were created by the will of the Michigan Legislature, and are subject to the supervision of the Michigan Supreme Court." *Evans v. Raines*, No. 1:05-cv-623, 2006 WL 2244139, at *4 (W.D. Mich. Aug. 4, 2006) (citations omitted) (finding a hybrid district-circuit court to be entitled to sovereign immunity).

[8]It is not certain that Dearborn would bear the ultimate cost of any judgment against the Nineteenth District Court.  *See Barachkov*, 311 F. App'x at 867–68; *see also Cameron v. Monroe Cnty. Probate Court*, 579 N.W.2d 859, 861 (Mich. 1998) (noting that the plaintiffs "received $25,000 from the state of Michigan" to satisfy a judgment in their favor against a state probate court); *Dolan*, 666 F. Supp. 2d at 760–63 (determining that it was unclear whether the city would be liable for a judgment against Michigan's Fifteenth District Court).  *But see Lowe*, 610 F.3d at 325–26 (rejecting the argument that state indemnification of a political subdivision's obligation to pay judgments against it means that the state is "potentially liable" under the first factor of the four-factor test).  As an aside, the district court in this case recently upheld sanctions against the defendants for failing to arbitrate in good faith because they failed to include a Dearborn official with authority to accept a settlement agreement in the arbitration discussions. *See Pucci v. 19th Dist. Court*, 2009 WL 596196, at *6–8 (E.D. Mich. Mar. 6, 2009).  Arbitration failed because the City of Dearborn rejected the settlement agreement worked out by the parties.

that it is not 'the sole criterion for determining whether an agency is a state entity for sovereign immunity purposes.'" *Ernst*, 427 F.3d at 364 (quoting *S.J. v. Hamilton County*, 374 F.3d 416, 421 (6th Cir. 2005)) (*en banc*) (emphasis added). Our need to inquire beyond the issue of financial liability relates back to the Supreme Court's emphasis that the Eleventh Amendment incorporates "twin reasons" for granting states sovereign immunity: the desire not to infringe either a state's purse or its dignity. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994). Sovereign immunity, therefore, "does not exist solely in order to prevent federal-court judgments that must be paid out of a State's treasury; it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Seminole Tribe v. Florida*, 517 U.S. 44, 58 (1996) (citation and internal quotation marks omitted); *see also Hess*, 513 U.S. at 39 (recognizing that the Eleventh Amendment "emphasizes the integrity retained by each State in our federal system"). Therefore, in certain cases—such as the one before us here—the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity.

This case would not be the first instance in which we have declared that a district court's sovereign-immunity analysis focusing only on the financial-liability factor is deficient. In *Barachkov*, we reversed the district court's determination that a Michigan district court is not entitled to sovereign immunity based solely on the grounds that the state is not liable for judgments against the court and remanded the case to the district court to "undertake an analysis of the other three factors." 311 F. App'x at 868–69. In fact, the partial dissent in *Barachkov* undertook that analysis and would have found that 41B District Court is entitled to sovereign immunity. *See id.* at 873–74 (Batchelder, J., concurring in part and dissenting in part). Following the lead of *Barachkov*'s partial dissent, an analysis of *Ernst*'s three other arm-of-the-state factors with respect to the Nineteenth District Court compels a finding that Michigan's district courts, including the Nineteenth District Court, are arms of the state for sovereign-immunity purposes.

The Michigan Constitution unquestionably establishes a unified state judicial system, of which the Nineteenth District Court is a subdivision, under the control and administration of the Michigan Supreme Court. Thus, the second factor identified in *Ernst*—"the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions"—favors granting sovereign immunity. *Ernst*, 427 F.3d at 359.

Michigan's Constitution vests the state's judicial power "*exclusively in one court of justice* which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction *that the legislature may establish*," Mich. Const. art. VI, § 1 (emphasis added), and vests in the Supreme Court "general superintending control *over all courts*," Mich. Const. art. VI, § 4 (emphasis added). Additionally, state statutes establish "judicial districts of the district court each of which is *an administrative unit subject to the superintending control of the supreme court*." Mich. Comp. Laws § 600.8101(1) (emphasis added); *see also* Mich. Comp. Laws § 600.822l (granting "full authority and control [in district judges] *subject to the supervision of the supreme court*" (emphasis added)). Thus it is the *state* legislature that establishes and defines the authority of the district courts, and it is the *state* supreme court that exercises supervisory and administrative control over those district courts. The local funding units have no such influence.

The Michigan Supreme Court has repeatedly affirmed the unitary nature of the state's judicial power and the Michigan Supreme Court's exclusive role as supervisor and administrator of all of the subunits of that "one court" system. The Michigan Supreme Court held: "Despite the complications of the trial court environment, the case law, taken as a whole, has come to strongly affirm that the *fundamental and ultimate responsibility for all aspects of court administration, including operations and personnel matters within the trial courts, resides within the inherent authority of the judicial branch* [of the State of Michigan]." *Judicial Attorneys Ass'n v. State*, 586 N.W.2d 894, 897 (Mich. 1998) (emphasis added). Thus, "[t]he judicial branch is constitutionally

accountable for the operation of the courts and for those who provide court services." *Id.* at 899. Additionally, "the expenses of justice *are incurred for the benefit of the State* and only charged against the counties in accordance with old usage, as a proper method of distributing the burden." *Grand Traverse Cnty. v. State*, 538 N.W.2d 1, 9 (Mich. 1995) (quoting *Stowell v. Jackson Cnty. Bd. of Supervisors*, 23 N.W.2d 557, 558 (Mich. 1885)) (emphasis added). Given these circumstances, there can be no doubt that all of Michigan's courts, including those trial-level courts funded by local funding units, are part of one, unified judicial branch *of the state*.[9] Consequently, just as the Michigan Supreme Court is an arm of the state, so is its Nineteenth District Court.

In addition to state control over the administration of the Nineteenth District Court, there is also considerable state control over judicial officers' appointments to the Nineteenth District Court. Consequently, *Ernst*'s third factor—"whether state or local officials appoint the board members of the entity"—also urges granting sovereign immunity. *See Ernst*, 427 F.3d at 359. The City of Dearborn oversees the employment of the Nineteenth District Court's staff,[10] but the city has no control over the selection and removal of the three judges that occupy its bench or the appointment of employees of the SCAO, which is the administrative arm of the Michigan Supreme Court. Although Michigan's district judges are elected, "[i]f a vacancy occurs in the office of district judge, the governor shall appoint a successor to fill the vacancy . . . [and] the person appointed by the governor shall be considered an incumbent for purposes of this act." Mich. Comp. Laws § 168.467m(1).

State officials—not local officials—also control the removal of district judges. The governor of Michigan, "on a concurrent resolution of two-thirds of the members

---

[9]Consistent with the unitary nature of Michigan's judicial power, the Nineteenth District Court is itself only a subdivision of the "one district court" of Michigan. *See Judges of 74th Judicial Dist. v. Cnty. of Bay*, 190 N.W.2d 219, 224 (Mich. 1971) ("Michigan has but one district court. For the administration of the district court, the state is divided into judicial districts.").

[10]Even the extent of the local funding unit's authority over court staff is not unchallenged. In *Judicial Attorney's Association*, the Michigan Supreme Court "declared unconstitutional a number of Michigan statutory provisions that designated the local funding unit, and not the State, as the employer of Michigan circuit, district, and probate court employees." *Dolan*, 666 F. Supp. 2d at 761 n.8 (citing *Judicial Attorneys Ass'n*, 586 N.W.2d at 899).

elected to and serving in each house of the [state] legislature," may remove a judge "for reasonable cause, which is not sufficient ground for impeachment." Mich. Const. art. VI, § 25; *see also* Mich. Comp. Laws § 168.467l. Additionally, a majority of Michigan's House of Representatives has the power to impeach any judge or justice "for corrupt conduct in office or for crimes or misdemeanors," and any such impeached judicial officer shall be removed from office with a two-thirds concurring resolution by the Senate. Mich. Const. art. XI, § 7. The Michigan Supreme Court also may remove judicial officers for a broad range of reasons:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice.

Mich. Const. art. VI, § 30(2).

The State of Michigan, therefore, through its governor, legislature, and supreme court, exercise considerable control over the removal—and even appointment—of district court judges. The local funding units, conversely, do not. Consequently, the third *Ernst* factor heavily favors granting sovereign immunity.

The State's authority to establish a single, unified judicial body has long been recognized in our federal system. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938) ("[T]he constitution of the United States . . . recognizes and preserves the autonomy and independence of the [S]tates . . . in their judicial departments."). Consequently, the fourth *Ernst* factor—"whether the entity's functions fall within the traditional purview of state or local government"—also strongly suggests that sovereign immunity should attach to Michigan's district courts because their functions fall exclusively within the traditional purview of a State's judicial branch. *See Ernst*, 427 F.3d at 359. The Nineteenth District Court was established pursuant to Michigan's constitutional provision vesting the "judicial power of the state . . . in one court of

justice." Mich. Const. art. VI, § 1. Such language could not make clearer that this entity operates as part of an authority historically reserved to the State.

Our inquiry into the "traditional purview" of state government stems from the importance of dignity in the origins of our sovereign immunity doctrine; if the agency in question carries out a long-recognized state function, it is a particular affront to a state to subject this agency to suit. We have previously recognized that "[c]onsiderations of dignity are particularly relevant in a suit against a state court, which is the 'adjudicative voice' of the State itself." *Barachkov*, 311 F. App'x at 868. This respect for a state's dignity in Eleventh Amendment immunity analysis "is particularly true in the context of a court system that . . . is mandated by the state constitution to be uniform and to be supervised by one supreme court." *S.J.*, 374 F.3d at 421–22 (discussing Ohio's unified court system); *see also Barachkov*, 311 F. App'x at 868 (quoting same in connection with Michigan's 41B District Court). As noted above, Michigan's state constitution explicitly vests "the judicial power of the state . . . in one court of justice," headed by one supreme court with "general superintending control over all courts." Mich. Const. art. VI, §§ 1, 4. Our concern for the dignity of the state, therefore, also counsels in favor of granting sovereign immunity here.

Looking at these sovereign-immunity factors together, the importance of local funding units' potential liability is outweighed by the integrated role of Michigan's district courts within the state judiciary (as provided for by Michigan's Constitution and statutes), the degree of supervision and control that the Michigan Supreme Court and legislature exercise over those courts, the role of state actors in appointing and removing district court judicial officers, and the traditional state function the Nineteenth District Court carries out. The Nineteenth District Court (as with Michigan trial-level district courts generally) is entitled to the immunity protections of the Eleventh Amendment, and all federal claims against it must be dismissed. As an officer of the Nineteenth District Court, Somers also is entitled to sovereign immunity from all federal claims against him in his official capacity seeking damages and retrospective relief.

IV.

Although Somers is entitled to sovereign immunity in his official capacity with respect to damages and retrospective relief, the sovereign-immunity doctrine does not bar Pucci's suit against Somers in his individual capacity, *see Ecclesiastical Order of the Ism of Am., Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988), or against him in his official capacity with respect to declaratory and injunctive relief, *see Thomson v. Harmony*, 65 F.3d 1314, 1320–21 (6th Cir. 1995). Somers argues that he is nonetheless immune from suit because he is entitled to qualified immunity against both Pucci's due process and retaliation claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[A] defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established" at the time of the defendant's allegedly unconstitutional conduct. *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010) (citation and internal quotation marks omitted). Somers has claimed qualified immunity as to both Pucci's due process and retaliation claims. We analyze each in turn.

A.

In *Silberstein v. City of Dayton*, our court considered a procedural due process claim similar to the one raised by Pucci here. 440 F.3d 306 (6th Cir. 2006). The court's opinion and framework lends itself to Pucci's due process claim, and we therefore follow its approach.[11]

---

[11]Since *Silberstein*, the Supreme Court has clarified that this approach is not mandatory; courts are not mandated to address each prong of qualified immunity in any particular order. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). In certain cases, however, the approach will still lend clarity.

1.

The first prong of the qualified immunity analysis asks whether a constitutional violation has occurred, that is, whether "a violation could be made out on a favorable view of the parties' submissions." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the context of Pucci's due process claim, this inquiry has two subparts: first, whether Pucci had a property interest that entitled her to due process protection, and, second, what level of process was due. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Silberstein*, 440 F.3d at 311.

Governmental employees may have a property interest in continued employment, in which case they must be afforded due process before being discharged. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1986). These property interests are created by a source independent of federal law, such as state law. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (noting the question of whether a constitutionally protected property interest exists is often a question of state law); *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997) ("The existence of a property interest depends largely on state law."). In this case, therefore, we look to Michigan state law to determine whether Pucci had a property interest.

Michigan law generally presumes that employment relationships are "at-will" arrangements; at-will employees, in turn, have no property interest in their continued employment. *Lytle v. Malady*, 579 N.W.2d 906, 910–11 (Mich. 1998) (noting the "strong presumption of employment at will" under Michigan law). Parties may overcome this presumption and show employment was under a "just cause" arrangement in one of three ways:

> (1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee.

*Id.* at 911 (quotations omitted).  Should Pucci overcome this presumption and prove she was a "just cause" employee, under Michigan law she would possess constitutionally protected property interest in her employment.  *Loudermill*, 470 U.S. at 541; *see also Silberstein*, 440 F.3d at 311.  In contrast, should she be considered an at-will employee, she would have no constitutionally protected property interest.  *See Bishop v. Wood*, 426 U.S. 341, 345–47 (1976) (noting that because the petitioner "held his position at the will and pleasure of the city," his discharge did not deprive him of a constitutionally protected property interest).

The parties disagree as to whether Pucci has successfully rebutted the at-will presumption, and Somers points to evidence that Pucci was in fact an at-will employee.  Some evidence that Pucci in fact may have been an at-will employee does not necessarily defeat Pucci's claim of a constitutional interest at the summary judgment stage, however.  "If . . . the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the [qualified immunity] appeal."  *Morrison v. Bd. of Trs. of Green Tp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks omitted).  As the *Saucier* Court noted, the inquiry at the qualified immunity stage is whether "a violation could be made out" when the record is "[t]aken in the light most favorable to the party asserting the injury," not whether the plaintiff has actually satisfied his burden. 533 U.S. at 201.

As the district court found, Pucci has offered evidence indicating the Michigan court system voluntarily adopted protocols and procedures that instilled in Pucci a valid "expectation of continued employment" under Michigan state law.  *Pucci v. 19th Dist. Court*, 565 F. Supp. 2d 792, 808 (E.D. Mich. 2008).  Taken in the light most favorable to the plaintiff, the record suggests that Pucci had a property interest in her continued employment, such that termination without any process would have violated the Fourteenth Amendment.  The district court's rejection of Somers's claim that Pucci lacked a property interest was therefore proper.

Because a reasonable jury could find that Pucci had a constitutionally protected interest in her continued employment, the second prong of a procedural due process inquiry determines what process Pucci was due. "For a public employee with a property interest in continued employment, due process includes 'a pre-termination opportunity to respond, coupled with post-termination administrative procedures.'" *Silberstein*, 440 F.3d at 315 (quoting *Loudermill*, 470 U.S. at 547–48). The parties in this case "do not dispute that the plaintiff was not provided with any pretermination procedural process." *Pucci*, 565 F. Supp. 2d at 808. Therefore, if Pucci did have a constitutionally protected property interest in her continued employment, her right to due process was violated.

Because the facts read in the light most favorable to Pucci permit the inference that she had a protected property interest in continued employment and received no process before dismissal, Pucci's due process claim survives the first prong of the qualified immunity analysis.[12]

2.

If a constitutional violation can be found, the second prong of a qualified immunity analysis examines "whether the right was clearly established" at the time of the deprivation. *Saucier*, 533 U.S. at 201. Obviously, if Pucci is ultimately found to have a property interest in her employment, her right to at least some pretermination process was clearly established. Since she received no process, Somers is not entitled to qualified immunity. We recognize that ultimately the precise process due may be an issue in this case. Indeed, Pucci argues that the Nineteenth District Court, of its own accord, implicitly adopted the safeguards afforded to Dearborn civil servants. We leave it to the district court to resolve this issue if it becomes necessary and for now conclude only that a complete absence of process does violate a clearly established right, assuming that a determination is made that Pucci had a property interest in continued employment.

---

[12]Pucci has not proved a property interest in her continued employment as a matter of law. As the district court noted, the plaintiff has simply "created an issue of fact whether, by implicitly adopting these policies—even voluntarily, and in a non-contractual manner—the court created an expectation of continued employment." *Pucci*, 565 F. Supp. 2d, at 808.

B.

Somers has also raised a defense of qualified immunity with respect to Pucci's First Amendment retaliation claim.  As with the due process claim, the qualified immunity analysis must assess whether Pucci has claimed a constitutional violation based on the record, and, if so, whether the right was clearly established at the time of termination.

1.

A plaintiff alleging First Amendment retaliation "must prove that 1) he engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (*en banc*)).

In this case, the central issue within the "protected conduct" prong revolves around whether Pucci's speech was protected at all, given that she was a government employee at the time.  The Supreme Court has explained "that when a public employee speaks . . . as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983).  However, "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  But "when public employees speak pursuant to their official duties rather than as citizens, the Constitution does not insulate their communications from employer discipline." *Weisbarth v. Geauga Park Dist.*, 499 F. 3d 538, 546 (6th Cir. 2007) (internal quotation marks omitted).  To establish whether a public employee is speaking as a citizen, we look to numerous indicia establishing the "scope of the employee's professional duties," *Garcetti*, 547 U.S. at 425, including "ad hoc or de facto duties . . . within the scope of

an employee's official responsibilities despite not appearing in any written job description." *Weisbarth*, 499 F.3d at 544.

Somers argues that Pucci's speech about his practices was an internal complaint about other court personnel, and therefore her speech is not protected. Whether Pucci's complaint to SCAO was within her workplace duties is a question of fact, but a favorable reading of the record indicates that her complaints fell outside Pucci's assigned tasks as an administrator, given that this was an extraordinary rather than everyday communication. Similarly, the nature of Pucci's complaints implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection. *See Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir.1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.").[13]

The second and third prongs of a First Amendment retaliation claim are equally established under the facts in the record, taken in light favorable to the plaintiff. Pucci's termination would obviously deter a person of ordinary firmness from continuing to engage in conduct for which they were fired. *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1055 (6th Cir. 2001). Similarly, as to causation, "Somers set in motion the process to eliminate the plaintiff's job within months of his assumption of authority as chief judge. Moreover, the record contains abundant evidence of his animosity toward the plaintiff's continued employment with the court and his efforts to remove her from the employee [rolls] even before he assumed that position. . . . A jury could conclude from this evidence that Judge Somers's motives for removing the plaintiff were unconstitutional and retaliatory." *Pucci v. Nineteenth District Court*, 565 F. Supp. 2d 792, 810 (E.D. Mich. 2008). Reading the record in her favor, Pucci has a valid First Amendment retaliation claim.

---

[13] If the plaintiff shows that the speech at issue addresses a matter of public concern, the court must also consider whether the employer had an overriding state interest in efficient public service that would be undermined by the speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Somers, however, has offered no reason that raising the sorts of concerns voiced here would jeopardize judicial efficiency. Therefore, *Pickering* balancing is satisfied.

2.

The law governing First Amendment retaliation claims has been well-developed by this jurisdiction's prior opinions. The facts of this case's retaliation claim dovetail with other successful First Amendment claims where a plaintiff was allegedly terminated because he or she publicly disclosed serious–and often unconstitutional–misconduct by superiors. *See, e.g.*, *Taylor v. Keith*, 338 F.3d 639 (6th Cir. 2003) (holding police officers who alleged they were terminated because they reported incidents of police brutality had a valid retaliation claim); *Lucas v. Monroe County*, 203 F.3d 964 (6th Cir. 2000) (holding plaintiffs who alleged they were excluded from a government vehicle-towing program because of their public comments about defendant's alleged political patronage scheme possessed a valid retaliation claim). At the time of Pucci's complaints, the law had clearly established that her comments were constitutionally protected as a matter of public concern and that termination in response to such comments was a violation of her First Amendment rights. Somers is therefore not entitled to qualified immunity with respect to Pucci's First Amendment claim.

V.

For the foregoing reasons, we reverse the district court's denial of summary judgment to the Nineteenth District Court and to Somers in his official capacity with respect to damages and retrospective relief because these defendants are entitled to immunity under the Eleventh Amendment, affirm the district court's denial of qualified immunity to Somers in his personal capacity, and remand for further proceedings.